UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GARRY TURNER

Plaintiff,

v.

Case No. 10-cv-12907
Paul D. Borman
United States District Judge

GRAND TRUNK WESTERN RAILROAD COMPANY,

Defendant.

_______________________________/

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT and DISMISSING THE ACTION**

Garry Turner ("Plaintiff") alleges that he suffers from respiratory injuries caused by exposure to dust, diesel exhaust fumes, herbicides, and other toxins that he came into contact with while performing duties for his former employer, Grand Trunk Western Railroad Company ("Defendant"). Plaintiff alleges, pursuant to the Federal Employers' Liability Act ("FELA"), 45 U.S.C. §§ 51, *et seq*., that his injuries are a result of, or were aggravated by, Defendant's negligence, because Defendant did not provide Plaintiff with proper protection from the allegedly harmful substances. In unrelated prior litigation, Plaintiff sued his former employer for hearing loss, and for personal injuries caused when he slipped and fell at work.

The Complaint was filed on July 23, 2010. (Dkt. No. 1.) Defendant filed the instant Motion for Summary Judgment on March 29, 2011. (Dkt. No. 13.) Plaintiff responded on April 29, 2011 (Dkt. No. 18), and Defendant replied on May 17, 2011 (Dkt. No. 19). The Court held a

hearing on August 22, 2011.

For the reasons stated below, the Court will grant Defendant's Motion.

## I. BACKGROUND

### A. Procedural History

This case was originally filed in the Eastern District of Michigan on November 25, 2008. *Turner v. Grand Trunk Western R.R. Inc.*, No. 08-14920 (Roberts, J.). Plaintiff's original Complaint alleged that the toxic substances Plaintiff was exposed to while working included asbestos.

On December 19, 2008, Defendant filed a Notice of Tag-Along Action, advising the Court that the case may be transferred to the Eastern District of Pennsylvania as part of the multidistrict litigation entitled *In re: Asbestos Products Liability Litigation*. The Clerk of the Judicial Panel on Multidistrict Litigation ("JPML") sent counsel for both parties a conditional transfer order on January 9, 2009. (Pl.'s Resp., Ex. A, Jan. 9 Letter.) The letter, which was sent via ordinary mail, stated that a notice of opposition to transferring the case was due by noon on January 26, 2009, and suggested transmitting the notice by facsimile. Plaintiff timely filed a notice of opposition. (Pl.'s Resp., Ex. B, Notice of Opposition.)

In a letter dated January 27, 2009, sent via ordinary mail, the JPML Clerk informed Plaintiff that the notice of opposition was received and that a motion and brief were due by February 11, 2009. The letter discussed various filing requirements, but did not state that Plaintiff's counsel was required to register under the Eastern District of Pennsylvania's Case Management/Electronic Case Files ("CM/ECF") system. Plaintiff timely filed his Motion to Vacate Transfer Order.

On April 21, 2009, the JPML filed a transfer order in Plaintiff's case. This order, which was filed with the Eastern District of Michigan on the CM/ECF docket in case number 08-14920 (ECF No. 8), effectively denied Plaintiff's Motion to Vacate Transfer Order and transferred the litigation to the Eastern District of Pennsylvania.

On April 6, 2010 – almost a year after Plaintiff's case was transferred to the Eastern District of Pennsylvania – Judge Eduardo C. Robreno filed an Order setting a status conference for all parties involved in the *In re: Asbestos Products Liability Litigation* case. The Order noted that "failure to appear at the conference shall result in the dismissal of the case without prejudice." Plaintiff's counsel never received this Order because, unlike previous filings, it was only electronically filed and was not mailed or faxed to counsel. Plaintiff's counsel, who was registered on this Court's CM/ECF system, had not registered under the Eastern District of Pennsylvania's CM/ECF system to receive notice of electronic filings.

Plaintiff's counsel did not appear at the status conference, and his case was dismissed without prejudice on May 11, 2010. Plaintiff's counsel alleges that they received the Order of Dismissal by ordinary mail on June 10, 2010. Plaintiff's counsel did not file a motion to reopen the case in the Eastern District of Pennsylvania. Instead, on July 23, 2010, the instant Complaint was filed with this Court with all references to asbestos removed.

**B. Plaintiff's Work History**

Plaintiff worked for Defendant from 1976 until January 2008. From 1976 to 1986, Plaintiff spent a majority of his workday indoors, but he did have some responsibilities that required him to be in the train yards where he was exposed to diesel fumes from idling trains. Plaintiff was laid off in 1986 but returned to work for Defendant in 1988. From 1988 to 1992,

Plaintiff worked indoors and was not exposed to any diesel exhaust or other toxins.

From 1992 to 2004, Plaintiff worked at Defendant's intermodal yard in Ferndale, Michigan. Plaintiff's duties at the Ferndale yard required him to be outside for half the day and inside for the other half. Plaintiff states that during his time at the Ferndale yard, his exposure to diesel fumes was constant:

> A. Well, working around the building, in and out of the building, you had a canopy over the truck base where the trucks checked. And the trucks would sit there idling, and the canopy would hold the diesel fumes, and the whole building was saturated with diesel fumes.
>
> [. . . .]
>
> A. I was – had to go out the door underneath the canopy to go out to check the train.
>
> Q Okay. So that would be the extent of being exposed to anything that might have been idling there is just walking out to the yard?
>
> A. The whole building was covered with diesel, soot from all the trucks idling under there.
>
> Q Well, are you talking about inside the building?
>
> A. The fumes got in the building because the ventilation was on the roof and it sucked it all in.
>
> Q. I can't – explain that to me. If the – if the tractor-trailers are under canopy and the ventilation is on the roof, how – how did –
>
> A. It would come in the doors. It would come in the ventilation. It would come in the windows if the windows were open.

(Def.'s Mot, Ex. I, Turner Dep. 82, 86-87.) Plaintiff alleges that he began having breathing

difficulties while performing his job at the Ferndale yard.

From 1993 to approximately 2005, in addition to his employment with Defendant, Plaintiff performed contractual work for Defendant through his personal company, A.A.E. Services. Plaintiff alleges that because these services usually occurred after normal work hours when the yards were not in use, Plaintiff's exposure to fumes was "minimal." (Turner Dep. 32.)

From 2004 to 2008, Plaintiff worked at Defendant's offices in Troy, Michigan. He was not exposed to diesel fumes during this time.

**C. Plaintiff's Medical History**

Plaintiff states that he began to have breathing difficulty while working for Defendant during the 1992 to 2004 time period. However, his breathing issues became prevalent in 2005 after recovering from pneumonia.

> Q. . . . . Going to 2004 when you had pneumonia, I want to know –
>
> A. 2004, 2005. I think it was five.
>
> Q. That's fine. But my question for you is after you completed the medication and what the doctor prescribed to you, were you back – was your health status back to where it was prior to contracting the pneumonia, your respiratory abilities, your breathing?
>
> A. No.

(Turner Dep. 109.)

In May 2005, Plaintiff's primary care physician, Dr. Leonard Kasperowicz, referred him to Dr. Jeffrey Bruner, an allergist, for a consultation regarding Plaintiff's respiratory issues. Dr. Bruner's impressions were as follows:

> 1. Perennial allergic rhinoconjunctivitis due to feathers, horse, [sic] dust and mold.
>
> 2. Seasonal allergic rhinoconjunctivitis due to trees, grasses, weeds, ragweed and mold.
>
> 3. Vasomotor rhinitis from perfumes, strong odors and smoke.
>
> [. . . .]
>
> 5. Mixed bronchial asthma the extrinsic factors noted above and intrinsically from perfumes, chemicals, smoke, increased humidity and infections.

(Def.'s Mot., Ex. K, Bruner Note.) Dr. Bruner prescribed Advair and Albuterol and encouraged Plaintiff to avoid his allergens. (*Id.*) Specifically, Dr. Bruner offered Plaintiff guidance on the avoidance of ragweed, pollen, dust, mold, animals, feathers and horses. (*Id.*) Dr. Bruner did not, however, note that Plaintiff should avoid diesel fumes.

> Q. Do you know if he told you to avoid diesel exhaust at work when you went back to work?
>
> A. I don't believe he told me that, no.

(Turner Dep. 125.)

Dr. Kasperowicz also referred Plaintiff to a pulmonary specialist, Dr. Christopher Hughes. During the initial consultation in May 2005, Plaintiff told Dr. Hughes that "[h]e is 'allergic to everything that grows,'" and that he "works on a railroad and is exposed to various dusts, fumes, [and] toxins . . . ." (Def.'s Mot., Ex. L, May 2005 Hughes Note.) Dr. Hughes noted that Plaintiff has "difficulty in breathing when exposed to certain dusts and fumes such as menthol cigarettes." (*Id.*) While Dr. Hughes recommended that Plaintiff "[a]void toxins," he did not specifically mention diesel fumes or any work-related substances in the medical record. (*Id.*)

Plaintiff was examined by Dr. Hughes a second time in November 2005. Dr. Hughes noted that Plaintiff had "some intermittent cough and congestion, also a heaviness in the chest that he feels sometimes stressfully, sometimes not." (Def.'s Mot., Ex. N, November 2005 Hughes Note.) Dr. Hughes again did not state in his medical record that Plaintiff's respiratory symptoms were related to diesel fumes or other work-related substances. However, Plaintiff testified that Dr. Hughes did attribute his respiratory issues to work-related substances during the November 2005 consultation:

> Q. My question to you is just did you – did Dr. Hughes ever tell you that any of the problems, respiratory problems you were having could be related to the substances you were exposed to while working for the railroad.
>
> A. Yes. Yeah.
>
> Q. Okay. And did he tell you to avoid those substances?
>
> A. Told me to avoid the dust and pollen.
>
> Q. Did he also tell you to avoid any smoke, any type of smoke?
>
> A. I don't really remember.
>
> [. . . .]
>
> Q. Again, just so I'm clear, earlier on when I was questioning you there was an indication that there was – you indicated to me that Dr. Hughes may have told you that some of your respiratory problems were due to some of the exposures you had at work. Do you remember testifying to that?
>
> A. Yes.
>
> Q. Okay. And is that testimony accurate? Do you recall that type of discussion with him?

A. I discussed a lot of things with him.

Q. Okay.

A. I'm not clear on everything.

Q. But my question is that discussion that some of the substances you were exposed to at work were causing you problems, do you recall having that discussion with him at the May 2005 office visit?

A. No. Not at – like I said, I remember discussing some things with him, but I don't know the details. I can't remember the details.

Q. Okay. Well, let me ask you this. You had another visit in November of 2005 some months later. Do you remember having that conversation with him in the November 2005 visit that some of the substances at work may be causing you problems?

A. Yeah, the November one probably. The first one was – the second time yes, probably the second visit. The first one no.

(Turner Dep. 130-33.)

Although Plaintiff consulted with both Dr. Bruner and Dr. Hughes in 2005, he testified that his breathing problems did not become persistent until 2007.

Q. Okay. Did you go back to Dr. Kasperowicz and tell him you had problems following the pneumonia?

A. I was – from then on it was a constant go to the doctor.

Q. What was your problem?

A. Oh, if I got sick I – come down with the flu a couple of times.

Q. Well, you indicated to me that since you got pneumonia sometime in 2004, 2005 you had constant respiratory

difficulties, is that fair –

A. Not constant.

Q. Intermittent?

A. Yes, intermittent.

Q. Well, what would bring on a respiratory problem?

A. Get sick in the wintertime.

Q. Okay. You get a cold?

A. I couldn't handle the cold air, the hot air. It gets real hot and I can't . . .

Q. And when did these problems manifest themselves? When did they occur? When were you getting these symptoms?

A. 2007, thereabouts, it started getting bad.

(Turner Dep. 109-10.)

Plaintiff also testified that the first time any doctor told him that diesel fumes were contributing to his respiratory problems was during a consultation with Dr. Kasperowicz in 2008. (Turner Dep. 170-71.)

## II. LEGAL STANDARD

Defendant has moved for summary judgment pursuant to Federal Rule of Civil Procedure 56(c). Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact[.]" Fed. R. Civ. P. 56(c). The Court must, however, view the evidence and draw all reasonable inferences in favor of the party opposing summary judgment. *Matsushita Electric Industrial Co., Ltd., et al. v. Zenith Radio Corp., et al.*, 475 U.S. 547, 587 (1986). Still, "the mere existence of a

colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Monette v. Electronic Data Systems Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996). The test is whether a rational trier of fact could, based on the evidence presented as a whole, find in favor of the non-moving party. *Matsushita*, 475 U.S. at 587.

## III. ANALYSIS

Plaintiff's cause of action arises out of FELA, which provides as follows:

> Every common carrier by railroad while engaging in commerce between any of the several States or Territories, . . . shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce . . . .

45 U.S.C. § 51. "No action shall be maintained under this chapter unless commenced within three years from the day the cause of action accrued." 45 U.S.C. § 56.

In determining the start of the statute of limitations under FELA, the Sixth Circuit applies one of two rules: the time-of-event rule, or the discovery rule. *Fonseca v. Consolidated Rail Corp.*, 246 F.3d 585, 588 (6th Cir. 2001). If a tortious act causes greater than de minimus harm, and an injury is discernable as a result of the act, the time-of-event rule applies. *Id.* However, where a significant injury is not detectable at the time of the tortious act, or if the cause of an injury is not apparent, the discovery rule applies. *Id.*

> Under the discovery rule, a cause of action is deemed to have accrued when "the plaintiff reasonably should have discovered both cause and injury." [*Hicks v. Hines, Inc.*, 826 F.2d 1543, 1544 (6th Cir. 1987)]. A prototypical discovery-rule case is one in which an occupational disease remains dormant long after a plaintiff is exposed to the causes of the injury.

*Id.*

The statute of limitations is an affirmative defense, and Defendant bears the burden of demonstrating that the limitations period has run. *Campbell v. Grand Trunk Western R.R. Co.*, 238 F.3d 772, 775 (6th Cir. 2001). "If the defendant meets this requirement then the burden shifts to the plaintiff to establish an exception to the statute of limitations." *Id.*

**A. Plaintiff's Discovery of Cause and Injury.**

Defendant argues that the medical records from Dr. Hughes, along with Plaintiff's deposition testimony, are conclusive evidence that Plaintiff had knowledge regarding his injury and its cause as early as May 2005, and was therefore "armed with sufficient information to trigger the statute of limitations." (Def.'s Br. 12.) Defendant also argues that by November 2005, Plaintiff had actual knowledge that his employment was contributing to his respiratory problems. Here Defendant relies on Plaintiff's deposition testimony, in which Plaintiff states that Dr. Hughes told him his respiratory problems could be related to his employment. (Turner Dep. 130.)

Plaintiff argues that his breathing problems in 2005 were intermittent, and that they seemed to be weather related: "I couldn't handle the cold air, the hot air." (Turner Dep. 110.) Plaintiff also points to testimony that he could not recall having breathing difficulties specifically while working at that time (Turner Dep. 88), and that the medical records from Dr. Hughes do not clearly indicate that Plaintiff's breathing difficulty was work related. While Dr. Hughes noted that Plaintiff was exposed to fumes and toxins at his job, he nevertheless related Plaintiff's breathing difficulties to allergies and his recent respiratory tract infection.

However, Plaintiff admitted at his deposition that Dr. Hughes told him at the November 2005 consultation that his breathing problems could be related to substances he was exposed to at

work. (Turner Dep. 133.) Further, even if his problems were intermittent at the time, Plaintiff decided they were severe enough to consult his primary care physician and two specialists. Based on Plaintiff's testimony, Dr. Hughes told him in November 2005 that his breathing difficulties could be related to the fumes he was exposed to while working for Defendant. At that point, Plaintiff "need only have made inquiry among doctors with average training and experience in such matters to have discovered that he probably had a good cause of action." *United States v. Kubrick*, 444 U.S. 111, 122-12 (1979). The statute of limitations was therefore triggered in November 2005 and expired three years later in November 2008, more than a year and a half before the instant Complaint was filed.

Plaintiff argues that the statute of limitations could not have begun in 2005 because it is not clear whether Plaintiff's more persistent respiratory problems, which began in 2007, are a distinct injury or merely an aggravation of his prior symptoms.

The Sixth Circuit opinion in *Fonseca* is instructive on this issue. In that case, the plaintiff was a railroad employee who experienced pain in his hands after using certain power tools in connection with his employment. *Fonseca*, 246 F.3d at 587. The plaintiff testified at his deposition that although the pain occurred frequently, it would always subside the following day. *Id.* The plaintiff testified that the he had experienced hand pain since the beginning of his employment in 1967, but that the pain did not become persistent until sometime in 1996 or 1997. *Id.* Plaintiff filed suit on March 29, 1999. *Id.*

The defendant argued that the plaintiff's claim was time barred because the plaintiff's persistent pain in 1996 or 1997, was merely an aggravation of his prior discomfort. The Sixth Circuit disagreed, reasoning that the plaintiff's deposition showed:

> that the frequent discomfort that Fonseca experienced as a laborer are [sic] a distinct injury from the "accumulated effects" he claims to have discovered within three years of filing his complaint. . . . . Although [defendant] characterizes the later continuous pain as a mere aggravation of Fonseca's prior discomfort, *Urie* [*v. Thompson*, 337 U.S. 163 (1949)] and *Aparicio* [*v. Norfolk & W. Ry. Co.*, 84 F.3d 803 (6th Cir. 1996)] instruct us to view the "accumulated effects" as a distinct injury unless the evidence suggests otherwise.

*Id.* at 591.

In the instant case, the evidence suggests that Plaintiff's injury he was treated for in 2007 is not distinct from the injury he sought medical treatment for in 2005. Although his problems were less severe in 2005, Plaintiff admits that they were of sufficient severity to seek medical treatment, and were thus distinguishable from the frequent work-related discomfort suffered by the plaintiff in *Fonseca*. Notably, during his consultation with Dr. Hughes, Plaintiff was apprised that his breathing difficulties may have been related to work-related substances. Unfortunately, despite being armed with this knowledge in November 2005, Plaintiff did not file this case until July 2010, after dismissal of his 2008 case filed with this Court and transferred by the JPML to Philadelphia.

The Court also notes that Plaintiff's 2008 complaint and 2010 complaint contain the same, verbatim language, aside from the presence of one additional word, "asbestos," in the 2008 complaint. Plaintiff's 2008 complaint reads, in pertinent part, as follows:

> During the course of his employment with Defendant, Plaintiff, GARRY TURNER, worked as a clerk at Defendant's yard in Oakland County, Michigan, and during this time Plaintiff was required to engage in job duties that exposed him to dust, diesel exhaust fumes, herbicides, asbestos and other toxins and chemicals without being provided adequate protection to is respiratory system. As a result of having to engage in these job duties and not

> being provided with proper and adequate and necessary protection, Plaintiff's physical condition deteriorated to a point where he was forced to seek medical care and treatment to his respiratory system.

(No. 08-14920, Compl. ¶ 4.) Plaintiff's 2010 complaint, in pertinent part, reads as follows:

> During the course of his employment with Defendant, Plaintiff, GARRY TURNER, worked as a clerk at Defendant's yard in Oakland County, Michigan, and during this time Plaintiff was required to engage in job duties that exposed him to dust, diesel exhaust fumes, herbicides and other toxins and chemicals without being provided adequate protection to is respiratory system. As a result of having to engage in these job duties and not being provided with proper and adequate and necessary protection, Plaintiff's physical condition deteriorated to a point where he was forced to seek medical care and treatment to his respiratory system.

(Compl. ¶ 4.)

Even viewing the facts in the light most favorable to Plaintiff, a reasonable juror could not find that Plaintiff discovered his cause of action after the November 2005 consultation with Dr. Hughes. Accordingly, the Court finds that Plaintiff's claim barred by the statute of limitations.

**B. Plaintiff Is Not Entitled to Equitable Tolling.**

Plaintiff argues that, if the statute of limitations began in 2005, then he is entitled to equitable tolling, since the case was originally filed in 2008 and Plaintiff's counsel never received notice of the electronically filed scheduling conference from the Eastern District of Pennsylvania. Nevertheless, Plaintiff could have attempted to maintain his original case by filing a motion in the MDL case pursuant to Federal Rule of Civil Procedure 60(b)(1). Instead, Plaintiff decided to, in essence, re-file this claim with this Court but remove reference to asbestos. Such tactical decisions are not grounds for equitable relief. Further, the Court notes

that, while Plaintiff's counsel was aware by April 2009 that the case had been transferred to Judge Robreno in the Eastern District of Pennsylvania, counsel apparently made no efforts to contact Judge Robreno's chambers or obtain an update regarding the status of the case for an entire year. *See Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 96 (1990) (noting that courts "have allowed equitable tolling in situations where the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period, . . . [but not] where the claimant failed to exercise due diligence in preserving his legal rights.") (footnotes omitted).

## IV. CONCLUSION

For the reasons stated above, the Court will

(1) **GRANT** Defendant's Motion for Summary Judgment, and

(2) **DISMISS** the action.

**SO ORDERED.**

PAUL D. BORMAN
UNITED STATES DISTRICT COURT JUDGE

Dated: 9-20-11
Detroit, Michigan